UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

BRAXTON THORNGATE                                    CIVIL ACTION

VERSUS                                               NUMBER: 17-03002

LEGACY OFFSHORE, LLC                                 SECTION: "I"(5)

## ORDER AND REASONS

Before the Court is the motion for partial summary judgment filed by Defendant, Legacy Offshore, LLC ("Legacy"). (Rec. doc. 22). The motion is opposed by Plaintiff, Braxton Thorngate ("Thorngate"). (Rec. doc. 26). Legacy's motion seeks dismissal of Thorngate's claims for Jones Act negligence and unseaworthiness on the basis that the undisputed material facts do not support a finding of medical causation. For the reasons that follow, the motion is hereby **granted.**

### A. FACTS

The following are the unchallenged facts, taken primarily from Legacy's Statement of Uncontested Facts. (Rec. doc. 22-5). Plaintiff did not file "a separate and concise statement of the material facts which the opponent contends present a genuine issue" as required by Federal Rule 56.2. He did, however, file a "response" to Legacy's statement of uncontested facts (rec. doc. 26-1), in which he admitted every one of Legacy's facts, save one: "Complainant denies in part that on February 25, 2017, he went to the Ohio Valley Medical Center complaining of chest pain which he had been experiencing for four to five days." (*Id.*). As will be addressed below, that mere denial is insufficient to establish a disputed material fact, as Legacy's statement to that effect is supported completely by the medical records attached to its Motion. (Rec. doc. 22-9 at p. 4).

Accordingly and pursuant to Local Rule 56.2 and Rule 56(e)(2) of the Federal Rules of Civil Procedure, the Court deems the facts in Legacy's statement to be true.

Thorngate was employed by Legacy as a tender aboard the DSV SUN RIVER from February 2, 2017 to February 7, 2017. He performed one dive on February 3, 2017 and one dive on February 4, 2017. Prior to both dives, Thorngate underwent a pre-dive neurological examination and after each dive, he underwent proper surface decompression protocol. After his last dive on February 4, 2017, Thorngate remained aboard the DSV SUN RIVER, performing normal deck duties without incident or complaint, never exhibiting any symptoms of decompression sickness, never requesting any medical treatment, and never complaining of any symptoms consistent with decompression sickness. He left the vessel on February 7, 2017 without incident.

On February 10, 2017, Thorngate slept for 15 hours, during which time he urinated on himself. Once he woke up, he had difficulty hearing, right shoulder pain, and right-sided weakness. He went to Teche Regional Medical Center ("Teche Regional") via ambulance, where he tested positive for amphetamines and opiates and incorrectly reported that his last dive had been on February 8, 2017.[1] Based on this inaccurate history, he was transferred to West Jefferson Medical Center for hyperbaric treatments.

Thorngate arrived at West Jefferson Medical Center ("WJMC") on February 10, 2017. He once again incorrectly reported the date of his last dive, this time stating that it was on February 6, 2017; he also admitted to taking illegal drugs the weekend of February 3-5, 2017.

---

[1] The unchallenged record evidence establishes that Thorngate's last dive took place on February 4, 2017. (Rec. doc. 22-6, Declaration of Anthony Dinisco).

At WJMC, Thorngate tested positive for amphetamine/methamphetamine, cannabinoid, cocaine, and opiates. He was diagnosed with (1) rhabdomyolysis, (2) NSTEMI (non-ST-elevation myocardial infarction), (3) hyperglycemia, (4) acute kidney injury, (5) acute liver injury, (6) polysubstance abuse, (7) leukocytosis, (8) hearing loss and possible decompression sickness, and (9) VTE prophylaxis. He received hyperbaric treatments for decompression sickness and was monitored for conditions possibly resulting from his serious drug and alcohol binge. He was discharged on February 17, 2017.

On February 25, 2017, Thorngate went to the Ohio Valley Medical Center ("Ohio Valley") complaining of chest pain that he had been experiencing for four to five days.[2] He again distorted his recent medical and work history, reporting correctly that he completed a dive on February 4, 2017 but reporting incorrectly that he had been diagnosed with decompression sickness two days later on February 6, 2017, when he had not made his first visit to Teche Regional until February 10, 2017. He again tested positive for opiates and cannabinoids. The emergency room physicians found that Thorngate was not suffering from complications of decompression sickness. The doctors at that facility went so far as to consult a hyperbaric specialist at the Divers Alert Network in reaching that conclusion. Thorngate was discharged on February 25, 2017 in a stable condition.

On March 12, 2017, Thorngate returned to Ohio Valley complaining of memory loss and confusion. He tested positive for opiates and cannabinoids and admitted snorting heroin. He was treated for altered mental status, encephalopathy, tobacco abuse, and decompression sickness. The emergency room physician found the most likely cause of his

---

[2] This is the only material fact disputed by Thorngate – and then only "in part." (Rec. doc. 26-1). However, the statement by Legacy is wholly supported by the pertinent medical records attached to its Motion (rec. doc. 22-9 at 4) and Thorngate has pointed to no contrary evidence.

3

altered mental status to be his illicit drug use, finding Thorngate was suffering from a drug overdose. Thorngate was discharged on March 13, 2017 and advised to attend drug rehabilitation at a mental-health facility.

Thorngate then went to the J.W. Ruby Memorial Hospital on March 15, 2017 complaining of altered mental status. He was hospitalized until April 14, 2017, requiring almost daily sedation, feeding tubes, and a brief period of intubation. His diagnosis at discharge was leukoencephalopathy, drug abuse, sympathetic storming, hypoxic brain damage, and decompression sickness sequela. He was referred to Peterson Rehabilitation Hospital.

Thorngate was admitted to Peterson Rehabilitation Hospital on April 14, 2017 and remained there until June 10, 2017. Based upon the medical history provided by Thorngate, Dr. Margaret Graynovsky opined his illness resulted from decompression sickness and polysubstance abuse, further stating that "[i]t is difficult to determine prognosis at this time given the extent of patient's injuries." (Rec. doc. 22-12).

### B. EXPERT OPINIONS

Legacy retained two experts who executed declarations that are attached to its Motion. Thorngate offers no expert opinion(s) in support of his position.

#### 1. Dr. Ian R. Grover

Dr. Ian R. Grover is a Professor in Clinical Emergency Medicine at the University of California San Diego (UCSD).[3] He is also the Medical Director of Hyperbaric Medicine and

---

[3] The background and opinions of Dr. Grover are taken from his Declaration, which was unchallenged by Thorngate. (Rec. doc. 22-13).

Wound Care Centers at the UCSD Medical Center. He is board certified in Emergency Medicine and Undersea Hyperbaric Medicine.

Dr. Grover reviewed Thorngate's February 2, 2017 pre-dive Neurological Sheet; the February 3, 2017 and February 4, 2017 Dive Sheets; and the February 3, 2017 and February 4, 2017 Daily Offshore Paperwork. He also reviewed Thorngate's February 15, 2017 statement and his medical records from Teche Regional, WJMC, and WVU Hospitals and University Health Associates (W.J. Ruby Memorial Hospital). It is undisputed that these records indicated that Thorngate performed dives on February 3, 2017 and February 4, 2017 using a 50/50 Nitrox mixture during each dive and undergoing conservative surface decompression following each dive. The Nitrox gas mixture is an added safety measure to prevent decompression sickness according to Dr. Grover.

The records further indicated there were no significant issues with either of the dives and there was no record of any problems suggesting decompression sickness. Thorngate then left the vessel on February 7, 2017.

Dr. Grover opines "[b]ased on Thorngate's diving history, personal statement, and emergency department records, it is almost impossible that his symptoms were due to decompression sickness." (Rec. doc. 22-13). Rather, "[t]he most likely cause for his symptoms was his polysubstance abuse." (*Id.*).

Dr. Grover reached that opinion based on the following analysis:

> The records I have reviewed do not support the conclusion that Thorngate suffered any form of decompression sickness while working for Legacy Offshore, LLC. The diving medicine textbooks, medical literature and the U.S. Navy Dive Manual state that DCS symptoms occur within hours after a dive, certainly within 24 hours. Also, the literature supports that the more serious the decompression sickness symptoms are, the sooner they present in relation to the dive that caused the

5

symptoms. Thorngate's symptoms were certainly severe, so the timing of the onset of his symptoms does not support a diagnosis of decompression sickness.

. . .

Thorngate completed dives on February 3rd and 4th, 2017 while employed by Legacy Offshore, LLC. These dives were uneventful, conducted in a safe manner, and conservative decompression protocols were followed. He then developed severe symptoms including altered mental status, right arm and leg weakness, and hearing loss. On arrival to the emergency department it was also noted that he had suffered an NSTEMI, rhabdomyolysis, an acute kidney injury, and an acute liver injury. These symptoms were identified on February 10th, 2017. The onset of these symptoms six to seven days after his final dive does not support a diagnosis of decompression sickness. Decompression sickness usually presents within hours after a dive, and almost all patients are symptomatic within 24 hours of a dive. The severe cases of decompression sickness, present even sooner after the offending dive, usually within 3 hours. If he had suffered decompression sickness, his symptoms would have been evident shortly after his final dive on February 4, 2017, not several days later. His symptoms are more likely due to his polysubstance use that was noted by several individuals and confirmed by his urine toxicology screen.

(*Id.*)

2. Dr. Robert D. Cox

Dr. Robert D. Cox is a professor in the School of Medicine at the University of Mississippi Medical Center in Jackson, Mississippi.[4] He is also the Medical Director of the Mississippi Poison Control Center, the Director of the Medical Toxicology Service at the University of Mississippi Medical Center, and an attending physician in the Adult Emergency Department at the University of Mississippi Medical Center.

---

[4] The background and opinions of Dr. Cox are taken from his Declaration, which was unchallenged in any way by Thorngate. (Rec. doc. 22-14).

Dr. Cox is a board-certified Medical Toxicologist and Emergency Physician through the American Board of Medical Specialties. He is also certified in Toxicology through the American Board of Toxicology. He routinely evaluates and treats patients with severe medical sequelae resulting from abuse and overdoses of cocaine, amphetamines, and opiates, including heroin. He is familiar with complications of scuba diving, including decompression sickness, and has been an open water certified scuba diver since 2006.

Dr. Cox reviewed Thorngate's February 3, 2017 and February 4, 2017 Neurological Sheets and Daily Offshore Records. He also reviewed Thorngate's medical records from Teche Regional, WVU Hospitals and University Health Associates (J.W. Ruby Memorial Hospital), WJMC, and Occupational Medical Clinics. Dr. Cox found Thorngate participated in dives on February 3, 2017 and February 4, 2017, using a 50/50 Nitrox air mixture during the dives and completing decompression chamber treatment upon surfacing. Thorngate then left the vessel on February 7, 2017. None of the records indicate he complained of any symptoms of decompression sickness. Per the medical records, Thorngate then sought medical attention at Teche Regional six days after his last dive on February 10, 2017, where he tested positive for amphetamines, methamphetamines, marijuana, cocaine, and opiates. He incorrectly reported his last dive was on February 8, 2017.

In analyzing Thorngate's records, Dr. Cox found the following medical literature and studies pertinent:

> After analyzing several thousand dives, the US Navy concluded that 98% of the symptoms of decompression sickness occur within twenty-four hours of surfacing.[5] Symptoms of cerebral decompression sickness usually occur rapidly after reaching the surface. A review of 1070 cases of central nervous system decompression sickness showed that

---
[5] Citing the U.S. Navy 2016. U.S. Navy Diving Manual revision 7. SS521-AG-PRO-010, 2016.

7

96% were symptomatic within 1 hour of surfacing and 99.5% were symptomatic within 12 hours of surfacing.[6] These authors found only a single case reported in the literature with symptom onset greater than 12 hours. A study from Cozumel of 200 divers treated for neurological symptoms reported a median time to the onset of symptoms of 1 hour, but reported 6 divers with symptom onset between 19 and 96 hours. The most common symptoms in this series were paresthesias, incoordination and weakness.[7] A study on 76 cases of delayed presentation for decompression sickness from Israel identified 23 cases with symptom onset greater than 12 hours. In this group, the mean time to symptom onset was 23, plus or minus 6 hours. Even in this group, 99.7% of the cases had symptom onset within 41 hours.[8]

Dr. Cox further found that the cause of Thorngate's rhabdomyolysis on February 10, 2017 most likely occurred in the 24 hours preceding hospitalization and that the condition is a well-known result of amphetamine and/or cocaine abuse. He further opined that hearing loss also occurs from cocaine abuse, cocaine and heroin abuse, and polysubstance abuse with heroin, cocaine, benzodiazepines, and alcohol and that the most common causes of hypoxic leukoencephalopathy are drug overdoses and prolonged hypozemia from medical causes such as severe hypertension, or a prolonged period of hypoxia with hypotension and acidosis. Finally, he adds that toxic leukoencephalopathy is a well-known syndrome associated the use of heroin, cocaine, ecstasy, amphetamine and carbon monoxide toxicity.

Based upon a review of the pertinent medical literature and studies, Legacy records, and medical records, Dr. Cox concludes as follows:

> The most likely cause of the rhabdomyolysis, elevated troponin, hearing loss and renal injury diagnosed in Braxton Thorngate on February 10, 2017 is drug toxicity. The timing is

---

[6] Citing Francis TJ, Pearson RR, Robertson AG, Hodgson M, Dutka DJ, Flynn ET. Central nervous system decompression sickness: latency of 1070 human cases. *Undersea Biomed Res* 1989; 15(6): 403-417.
[7] Citing Newton HB, Padilla W, Burkart J, Pearl DK. Neurological manifestations of decompression illness in recreational divers - the Cozumel experience. *Undersea Hyperb Med Soc* 2007;34(5):349-357.
[8] Citing Hadanny A, Fishlev G, Bechor Y, et al. Delayed recompression for decompression sickness: Retrospective analysis. *PLoS One.* 2015;10(4):1-13.

> not consistent with a diving injury 6 days prior to the incident and records do not indicate any diving injury. Rhabdomyolysis is a common occurrence following cocaine or amphetamine abuse in excessive amounts. Braxton Thorngate tested positive for amphetamines, cocaine and opiates. He admitted to taking ecstasy and cocaine.
>
> The most likely cause of leukoencephalopathy in Braxton Thorngate is drug toxicity. He continued to use drugs after he left Louisiana and returned to West Virginia. The cause could have been heroin, cocaine or amphetamines. I could not find any cases of leukoencephalopathy attributed to diving injuries. His treating physicians attributed his cause to a hypoxic injury. If he suffered that type of injury on his last dive, he would not have been asymptomatic the next 2 days until his ship reached shore. A much more likely cause is drug toxicity as is well described in the medical literature. Hypoxia resulting from an opiate overdose is also possible.

Dr. Cox concludes that Thorngate's injuries and symptoms were not caused by his February 3, 2017 or February 4, 2017 dive, as he did not develop symptoms until five to six days after his last dive, which he states is well outside of any known case.

### C. APPLICABLE LAW

#### 1. Summary Judgment Standard

A motion for summary judgment shall be granted if, and only if, the pleadings, depositions and affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. F.R.C.P. 56; *Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994)(*en banc*). Initially, the party moving for summary judgment must demonstrate the absence of any genuine disputes of material fact. When a party seeking summary judgment bears the burden of proof at trial, it must come forward with evidence that would entitle it to a directed verdict if such evidence were uncontroverted at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553 (1986). As to issues which the non-moving party has the burden of proof at trial, such as here, the moving party

may satisfy this burden by demonstrating the absence of evidence supporting the non-moving party's claim. *Id.* If that party succeeds, the burden shifts to the non-moving party to show that there is a genuine dispute for trial. *Id.* at 322-23, 106 S.Ct. at 2552-53.

Once the burden shifts to the respondent, he must direct the attention of the court to evidence in the record and set forth specific facts sufficient to establish that there is a genuine dispute of material fact requiring a trial. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553; F.R.C.P. 56(e). The responding party may not rest on mere allegations or denials of the adverse party's pleadings as a means of establishing a genuine dispute worthy of trial, but must demonstrate *by affidavit or other admissible evidence* that there are genuine disputes of material fact or law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49, 106 S.Ct. 2505, 2510 (1986)(emphasis added); *Adickes v. S.H Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598 (1970); *Little*, 37 F.3d at 1075. While the party opposing the motion may use proof filed by the movant to satisfy its burden, "only evidence – not argument. . . – will satisfy" the burden. *Solo Service Corp. v. Westowne Assoc.*, 929 F.2d 160, 164 (5th Cir. 1991).

There must be sufficient evidence favoring the non-moving party to support a verdict for that party. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510; *Wood v. Houston Belt & Terminal Ry.*, 958 F.2d 95, 97 (5th Cir. 192).

2. <u>Medical Causation</u>

Thorngate brings claims in this case under the Jones Act for negligence and unseaworthiness. (Rec. doc. 1). An employer is liable under the Jones Act only if the employer's negligence "caused the seaman's injury, in whole or in part." *Stowe v. Moran Towing Corp.*, 995 F.Supp.2d 570, 575 (E.D. La. 2014). "[C]ausation is established if the party's negligence played any part, even the slightest, in producing the injury. However, more than mere "but for" causation must be established." *Id.* Similarly, for an unseaworthiness claim to succeed, the plaintiff must prove the alleged unseaworthy condition "played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result of a reasonably probable consequence of the unseaworthiness." *Id.* at 576 (quoting *Phillips v. Western Co. of North America*, 953 F.2d 923, 928 (5th Cir. 1992)).

If in a suit under the Jones Act or general maritime law, the plaintiff is unable to present medical evidence or testimony that his injuries were caused by the defendant's negligence, then summary judgment in favor of the defendant is appropriate. *Hancock v. Diamond Offshore Drilling, Inc.*, No. 07-CV-3200, 2008 WL 3501015 (E.D. La. Aug. 8, 2008); *Johnson v. Horizon Offshore Contractors, Inc.*, No. 06-CV-10689, 2008 WL 916256 (E.D. La. Mar. 31, 2008); *Fauver v. Seadrill Americas, Inc.*, No. 15-CV-0049, 2016 WL 4098601 (S.D. Miss. Jul. 28, 2016).

**D. ANALYSIS**

As noted earlier, the facts as set forth by the Court above are both undisputed and well-supported by the record evidence attached to Legacy's motion. On the other hand, Thorngate, in opposition to that motion, has not offered any evidence or testimony of his

11

own. Given these circumstances, two of the aforementioned cases are particularly instructive.

In *Fauver*, *supra*, a seaman sued his Jones Act employer for damages after the employer allegedly failed to timely transport him to shore for medical treatment after he reported chest pains and dizziness. While disputing its negligence, the employer filed a motion for summary judgment "based solely on its claim that there is a complete absence of competent medical evidence that the defendant's alleged negligence was in any way a cause of the plaintiff's subsequent heart attack and alleged disability." *Id.* at *1. The court noted the following general rules regarding causation under the Jones Act – of particular interest here:

> In order to prevail on the issue of medical causation in a Jones Act case, *the plaintiff must present expert medical evidence that there is more than a mere possibility that a causal relationship exists between a Jones Act employer's alleged negligence and a seaman's alleged injury*
> . . .
> With respect to medical causation in a Jones Act case, the Fifth Circuit has clearly defined the test: "In a Jones Act case, a seaman has the burden of proving by medical testimony that his injuries were due to the defendant's negligence." *Johnson*, 2008 WL 916256 at *4 (citing *Ginter v. Sea Support Services, L.L.C.*, 2001 WL 1602154 (E.D. La. Dec. 12, 2001)).

Id. at *2-3 (emphasis added).

Unlike here, in opposition to the defendant's motion, the plaintiff in *Fauver* offered the testimony of two physicians. The first physician would testify that "the failure to provide prompt medical cared [sic] would '*typically*' adversely affect a heart patient." *Id.* at *3 (emphasis added). The court found that such generic statements are insufficient to prove a prima facie case of medical causation and did not even "reach the level of speculation or conjecture, which still would be insufficient." *Id.*

12

The second physician testified at his deposition that the alleged delay in transporting the plaintiff to the hospital "*could have* played a role" in his injury. *Id.* at *6. The testimony, at most, established "that it is a 'mere possibility' that the defendant's negligence caused the plaintiff's injury [which] is insufficient to withstand summary judgment." *Id.* Moreover, while "a defendant need only demonstrate the absence of evidence supporting an essential element of plaintiff's claim" on summary judgment, the employer in *Fauver* (like Legacy here) "also offer[ed] affirmative proof that there is no causative link between its alleged negligence and the plaintiff's subsequent heart problems." *Id.* at *8. The plaintiff's expert physician stated positively that the employer's alleged negligence had nothing to do with the plaintiff's injuries. The court granted the employer's motion for summary judgment, reasoning as follows:

> Coupled with the absence of causation evidence from the plaintiff, the report from [defendant's expert] leaves no doubt that the plaintiff cannot prevail on an essential component of his case, causation. The law is clear that a plaintiff must present medical causation evidence that goes beyond mere possibilities. The medical causation testimony presented by the plaintiff is merely that the alleged negligence possibly could have, not that it did, play a part in causing his injuries.

*Id.* at *8.

Similarly, In *Johnson*, *supra*, the court granted summary judgment in favor of the plaintiff's Jones Act employer when the plaintiff failed to prove by medical testimony that his injuries were caused by the employer's negligence. The plaintiff failed to present any expert testimony regarding medical causation and provided no evidence on causation. *Id.*

Finally, in *Hancock*, *supra*, the court granted summary judgment in favor of the plaintiff's Jones Act employer on the issue of medical causation, stating that as "[c]ourts have determined that a medical expert must be able to articulate that more than a mere possibility

13

of a causal relationship exists between the defendant's negligence and the injury for which the plaintiff seeks damages in order for a seaman to meet this burden," summary judgment was proper. *Hancock*, 2008 WL 3501015 at *4.

It is clear when viewing this record against the teachings of the above-cited cases that Thorngate cannot establish the existence of a genuine dispute of material fact as to medical causation. He presents no evidence at all in response to Legacy's motion, much less the type of expert testimony or declaration required to defeat that motion. The full extent of his opposition is the argument that certain portions of his medical records, because they list decompression sickness as a possible cause of his symptoms, should carry the day. This ignores both the full and undisputed factual picture of the case as well as the law cited and discussed above.

It is clear to the Court that, to the extent some of Thorngate's treating physicians included decompression sickness as a possible cause of his symptoms, any such diagnosis was based on demonstrably false medical histories related to them by Thorngate. The unobjected-to evidence in the record establishes as fact that Thorngate's last two dives aboard the SUN RIVER took place on February 3 and 4, 2017 and that he first complained of his symptoms on February 10, 2017, almost a week later. Yet for reasons unknown, he reported to his first provider at Teche Regional that his last dive was February 8, 2017 (rec. doc. 22-7 at p. 3), reported to his second provider at WJMC that his last dive was February 6, 2017 (rec. doc. 22-8 at p. 2) and reported to Ohio Valley that he last completed a dive on February 4, 2017 (which was correct) but reported incorrectly that he had been diagnosed with decompression sickness two days later on February 6, 2017, when he had not made his first visit to Teche Regional until February 10, 2017. And, notably, in every record in which

decompression sickness was mentioned as a possible cause of his symptoms, Thorngate also tested positive for polysubstance use.

Legacy's unchallenged expert declarations make clear why the forgoing inaccurate medical histories are so important here – the passage of six days from last dive to onset of symptoms as severe as those exhibited by Thorngate is inconsistent with established diving medicine textbooks, medical literature and the U.S. Navy Dive Manual and, according to Dr. Cox, would be "well outside of any known case." (Rec. doc. 22-14 at p. 7).

The unchallenged declarations of Legacy's experts and their opinions, based as they are on the experts' review, not only of the pertinent medical literature, but of all of Thorngate's medical records (the only documents Thorngate points to in *arguing* there is a genuine issue of material fact), are fatal to Thorngate's claims that Legacy's negligence or the unseaworthiness of its vessel caused his injuries.

Legacy has not only pointed to an absence of evidence to support the essential element of medical causation, it has affirmatively produced its own evidence that convincingly negates medical causation. In the face of this affirmative evidence, Thorngate's mere argument – not supported by any testimony or declaration – that portions of his medical records demonstrate a theoretical possibility that his claim is valid is insufficient to carry his burden in opposing Legacy's motion. For these reasons, Legacy's motion for partial summary judgment is hereby **GRANTED.**

New Orleans, Louisiana, this 30th day of April 2018.

MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE

15